***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission affirms with some modifications the Opinion and Award of Deputy Commissioner Donovan.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Travelers Insurance Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $450.17, which yields a compensation rate of $300.13 per week, based upon the Form 22 stipulated to by the parties.
5. The parties stipulated the following into the evidence of record at the hearing before the Deputy Commissioner:
 Stipulated Exhibits 1-15 consisting of plaintiff's medical and vocational records, pages 001-375.
 Defendants' Exhibit #1 Correspondence on security guard position.
6. The issues for determination by the Commission are:
 Whether plaintiff suffered an occupational disease as defined by the Workers' Compensation Act?
 If so, to what benefits is plaintiff entitled as a result of the occupational injury?
 If the claim is found to be compensable, what, if any, reduction, credit or offset from indemnity benefits is due defendants?
 If defendants are due a reduction, credit or offset, is this subject to an attorney's fee?
 Whether plaintiff is currently disabled as a result of his carpal tunnel syndrome or as a result of an unrelated, preexisting heart condition?
 ***********
Based upon all the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on June 17, 1943, and completed the seventh grade. Plaintiff worked for defendants for approximately 29 years prior to his leaving employment in September 2001.
2. Plaintiff was employed by defendants as a ham cutter. Six people on a line one floor above plaintiff cut the tails from halved pig carcasses, then sent the carcasses down a chute where they traveled along a conveyor belt to plaintiff's station. As the hams traveled down the chute, they were often bunched and on top of each other as they came to plaintiff for sawing. Plaintiff grasped each ham and aligned it with the feet towards him, and ran the ham through a saw, cutting off the feet. Plaintiff was the only foot cutter receiving the hams from the six tail cutters. At times, plaintiff was required to grasp the hams and flip them over in order to properly align them for sawing. Plaintiff processed approximately 16,000 hams per day and each ham weighed between 12 and 30 pounds. Plaintiff worked eight hours per day and was permitted to take two 15 minute breaks and one 30 minute lunch period per day.
3. In 1987, the lines were changed so that all personnel on the line were on the same floor. This eliminated the bunching of hams so that they no longer went down a chute to plaintiff's conveyor belt, but came to plaintiff in a more uniform way.
4. Beginning in 1994 or 1995, plaintiff was provided with assistance in aligning the hams for sawing. However, when the assistant was on a break or absent from work, plaintiff aligned the hams himself.
5. Plaintiff began experiencing pain and numbness in his hands in 1994. A note from defendants' physician, Dr. Fletcher, dated June 16, 1994, recorded that plaintiff sought treatment for pain and numbness in the right thumb and forearm. Plaintiff told Dr. Fletcher he thought the symptoms came from grasping hams to cut the foot off. Dr. Fletcher recommended that plaintiff wear a wrist splint while working, which plaintiff did.
6. Plaintiff's hand pain continued to worsen significantly during the three years prior to his leaving his employment with defendants. Plaintiff developed persistent weakness, pain and numbness in both hands.
7. On May 18, 2001, plaintiff presented to Dr. Agodichi Nwosu with complaints of shortness of breath, palpitations and fatigue with minimum exertion. Plaintiff gave a history of hypertension, arthritis and poor circulation. Following a number of tests including a catheterization, Dr. Nwosu diagnosed plaintiff with a severe and diffuse coronary ectasia and right coronary artery focal aneurysm.
8. On September 21, 2001, plaintiff applied for Family and Medical Leave (FLMA) due to heart problems. Plaintiff has not returned to work since that date.
9. On October 5, 2001, Dr. Nwosu provided an out of work note stating that plaintiff was unable to resume his usual work. On October 9, 2001, Dr. Nwosu completed a Certification of Health Care Provider in which he described plaintiff's condition as not amenable to surgery and that he anticipated life long treatment and follow up by plaintiff's primary treating physician. Dr. Nwosu felt that plaintiff could no longer perform strenuous activities or those with potential for cuts or bruises due to the blood thinners plaintiff was required to take for his condition. Dr. Nwosu released plaintiff to light duty work and recommended that plaintiff be limited to deskwork or answering the telephone.
10. Dr. Nwosu did not relate plaintiff's heart condition to his employment. The Full Commission finds that there is no causal relationship between plaintiff's heart condition and his employment with defendants.
11. On October 11, 2001, plaintiff presented to Dr. James Lowe upon referral from his primary treating physician, Dr. Edward Powell. Dr. Lowe is a plastic surgeon whose practice includes treating approximately 200 carpal tunnel patients per year. By October 11, 2001, plaintiff had complaints of persistent pain, weakness, swelling and numbness in both hands. Plaintiff gave Dr. Lowe a history of having these complaints for approximately three years. Dr. Lowe's initial examination showed that plaintiff had a positive Tinel sign and evidence of significant tenderness over the median nerve, weakness of the abductor pollicis muscle, and significant decrease in his two-point discrimination, which are all clinical signs of carpal tunnel syndrome. Dr. Lowe ordered a nerve conduction study which showed plaintiff had compression of the median nerve in both wrists and the ulnar nerve at the elbow level of both arms. Dr. Lowe found evidence of synovitis and tendonitis in both arms. Based upon his clinical findings, Dr. Lowe recommended that plaintiff undergo bilateral release surgery.
12. On October 11, 2001, plaintiff filed a second FMLA application due to bilateral hand surgery effective October 18, 2001.
13. On October 19, 2001, Dr. Lowe performed release surgery on the median and ulnar nerves of plaintiff's right hand, along with a synovectomy. Dr. Lowe performed similar surgery to plaintiff's left hand on November 30, 2001. The surgeries revealed evidence of chronic inflammation and scar tissue within the median nerve, indicative of long standing compression by the transverse carpal ligament.
14. Dr. Lowe concluded plaintiff's employment with defendants caused the compression of plaintiff's median nerve, which resulted in his bilateral carpal tunnel syndrome.
15. The Commission finds that the greater weight of the medical evidence supports a finding that plaintiff's employment with defendants was a significant contributing factor in the development of plaintiff's bilateral carpal tunnel syndrome, synovitis and tendonitis.
16. Dr. Lowe felt and the Commission finds that plaintiff's job duties in his employment with defendants placed him at an increased risk of developing the conditions of carpal tunnel syndrome, synovitis and tendonitis, as compared to members of the general public not so employed.
17. The compression of plaintiff's ulnar nerve was caused by plaintiff's employment with defendants.
18. Dr. Lowe stated and the Commission finds that plaintiff is totally disabled based solely upon his carpal tunnel syndrome.
19. Plaintiff was examined by Dr. Dennis B. Nicks of Plastic Surgery Specialists in March 2003. Dr. Nicks agreed with Dr. Lowe's assessment that plaintiff's employment with defendants contributed to his bilateral carpal tunnel syndrome as well as instigating synovitis of the flexor tendons at the wrists. Dr. Nicks concluded further that plaintiff's heart condition would not limit him from sedentary work, but that plaintiff's wrist problems limit him from working with his hands. Dr. Nicks assigned plaintiff a 10% permanent partial disability rating to his right hand, and a 25% permanent partial disability rating to his left hand as a result of his carpal tunnel syndrome. Dr. Nick felt plaintiff could perform light duty work that did not include repetitive motion or heavy lifting.
20. As a result of his carpal tunnel syndrome, synovitis and tendonitis, plaintiff has permanent restrictions of no use of either hand for more than five consecutive minutes or one hour total in an eight hour period for handling (seizing, holding, grasping, turning or otherwise working with the whole hand or hands) or fingering (picking, pinching or otherwise working primarily with the fingers). As a result, plaintiff is unable to return to his position as a cutter for defendants.
21. Plaintiff has not reached maximum medical improvement. Plaintiff's wrist condition is one of progressive deterioration and will require continuing medical treatment. Dr. Lowe felt that in addition to his current problems, plaintiff is developing deQuervain's disease and cubital tunnel syndrome which were not caused by plaintiff's employment, but were aggravated by his work activities.
22. For approximately 20 years prior to October 11, 2001, plaintiff operated a side business out of his home in which he purchased broken lawn mowers and repaired them for resale. Plaintiff worked at this business for short periods of time in the evenings, and for a few hours on weekends. Plaintiff did not pursue this work when his hands bothered him, and had stopped doing it completely by September 2001. The Full Commission finds that plaintiff's work on lawn mowers did not significantly contribute to his conditions of carpal tunnel syndrome, synovitis and tendonitis.
23. Defendants indicated that a job exists for plaintiff as a security guard at defendants' plant. Dr. Lowe felt that this position was not suitable for plaintiff due to exposure to cold temperatures, plaintiff's inability to use his hands to open heavy doors or write with a pen for more than five consecutive minutes, or to confront individuals as a security guard. The Commission finds that the position of security guard is not suitable for plaintiff and does not indicate an ability to return to work.
24. On June 13, 2003, vocational rehabilitation consultant Robert E. Manning Jr., prepared a report regarding plaintiff's future employment possibilities based upon plaintiff's medical records and a personal interview with plaintiff. Mr. Manning administered a Wide Range Achievement Test to assess plaintiff's ability to read, write and perform simple math assignments.
25. At the time Mr. Manning interviewed plaintiff, plaintiff was 59 years old. Plaintiff demonstrated reading and writing abilities on a fifth grade level. Plaintiff's primary work history was as a meat cutter. Based upon his evaluation of plaintiff, Mr. Manning found that plaintiff could not return to the type of work he had been performing for defendants due to his restrictions from the limited use of his hands. In examining other employment possibilities for plaintiff, including the security guard position offered by defendants, Mr. Manning concluded that there are no other job alternatives for plaintiff. Mr. Manning testified that plaintiff's loss of his upper extremities creates a more difficult employment situation than plaintiff's sedentary limitations, because plaintiff's work history involved working with his hands.
26. The Commission finds as fact that due to his conditions of carpal tunnel syndrome, synovitis and tendonitis, his age and his lack of education and training, plaintiff is permanently and totally disabled from employment of any kind.
27. Plaintiff's average weekly wage was $450.17 per week, which yields a compensation rate of $300.13 per week.
28. During plaintiff's period of disability, defendants paid plaintiff a total of $3,298.79 in short-term disability benefits from a plan entirely funded by defendants.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpel tunnel syndrome, synovitis and tendonitis were caused by and due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendants. Plaintiff's bilateral carpal tunnel syndrome, synovitis and tendonitis are not ordinary diseases of life to which the general public not so employed is equally exposed and are therefore, compensable occupational diseases. N.C. Gen. State. § 97-53(13); Booker v. Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979).
2. As a result of plaintiff's occupational diseases, he is permanently and totally disabled from employment, and is entitled to permanent and total disability payments of $300.13 per week beginning on October 11, 2001 and continuing for the remainder of his life. N.C. Gen. Stat. § 97-29.
3. Although plaintiff was initially released from his employment due to a heart condition, he was subsequently released to return to light duty by Dr. Nwosu. Accordingly, plaintiff's heart condition has not resulted in plaintiff's permanent total disability. Plaintiff's current disability is due solely to his compensable occupational diseases of bilateral carpal tunnel syndrome, synovitis and tendonitis. N.C. Gen. Stat. § 97-52. The Full Commission finds the circumstances in plaintiff's case are distinguishable from those in Harrell v. Stevens Co.,54 N.C. App. 582, 284 S.E.2d 343 (1981), in that the greater weight of the medical evidence in this case supports a finding that plaintiff is totally disabled due solely to his carpal tunnel syndrome and but for that condition he would be capable of some employment.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable occupational diseases as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19).
5. Defendants are entitled to a credit in the amount of $3,298.79 which was paid to plaintiff as short-term disability compensation from a plan entirely funded by defendants. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay permanent total disability compensation to plaintiff at the rate of $300.13 per week beginning on October 11, 2001 and continuing for the remainder of plaintiff's life. As much of said compensation as has accrued shall be paid in a lump sum, subject to a credit awarded to defendants below.
2. Defendants are awarded a credit in the amount of $3,298.79, to be deducted from the sums awarded to plaintiff in Paragraph 1 above.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay medical expenses incurred or to be incurred which are related to plaintiff's compensable occupational diseases when bills for the same have been approved, in accordance with the provisions of the Act.
5. Defendants shall pay the costs.
This the 26th day of July 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mb